And so we'll proceed with the first case, Citigroup Global Markets v. D&D Trust. May it please the Court, my name is Eugene Killian. I'm here on behalf of Defendant Appellant D&D Trust. We've reserved two minutes. In July 2005, Kenneth Carey gave Solomon Dweck $14 million in personal funds. Mr. Dweck was his nephew and business associate. It was not the first time that Mr. Carey had given Mr. Dweck enormous sums of money. In fact, within the previous month, he had given Mr. Dweck another $14 million. Right. As did your client, Mr. Sharpe. So I think the question is, what about that transaction would make it, would give any reason to believe that the transaction was known to be fraudulent by Mr. I don't know how to pronounce his name, is it Carer or Carer? Carey. You're never going to have a party obviously come, or rarely you're going to have Judge Lynch or party come up and say I committed fraud. I didn't ask that. I asked what is the reason to believe that it is fraudulent. I didn't ask for evidence that he had admitted it was fraudulent. I understand. As you say, that would not be likely. So there are a series of red flags that I believe need to be considered. First of all, the loan documents themselves have problems inherent in them that were noted by Judge Sand earlier in this case in denying summary judgment. For example, the two loan documents incorporate a control agreement that does not exist. Now, you may say that only goes to perfection, but I think it goes otherwise. I think a rational juror could look at that and say, this is such a major component of this deal. And Mr. Carey is such an experienced businessman that he would not have allowed this transaction to happen if he didn't have the control agreement. What would be in it for Mr. Carey to participate in a transaction in which he is providing money to someone in exchange for a share of profits to come in a transaction where the essence of what makes it fraudulent is there is no building to buy, there are no profits to come, and Mr. Dweck is about to go crash in his Ponzi scheme. What does Mr. Carey get out of this other than losing his $14 million? He had a track record of getting enormous sums of money from Mr. Dweck. And I believe, Judge Lynch, that you need to look at what happened after December 2005. And I think a reasonable juror would look at what happened after December 2005. And what would we find when we looked at that? You would find that Mr. Carey says he did not know until December 2005 that this transaction was fictitious. He knew by December that he had been defrauded out of $14 million. That's what he said. In January, he gives another $5.1 million to Mr. Dweck. In April 2006, he's negotiating to give Mr. Dweck another $25 million to buy a golf course in New Jersey. These are not things that someone would do if they felt they had been defrauded in December. He's still giving enormous sums of money to Mr. Dweck, and he's getting enormous sums of money back. And this money is not going to his company. $700,000 in February go into Mr. Carey's pocket. $5 million in March. $2.2 million in funds that Mr. Dweck stole from PNC go directly to Mr. Carey. None of this goes through KLCC. Another $1.8 million at the end of April 2006. So a rational finder of fact could look at this totality of circumstances and determine that based on all of these red flags, Mr. Carey was not a victim, he was a perpetrator. And this deal, this fictitious deal, was known to be fictitious from the beginning. How was it going to help him to participate in this fraud by putting in $14 million? Because he thought he was going to continue to receive enormous returns as he had in the past. And his money came into him in 2006. And why would he then demand this pledge of securities as collateral for this transaction, other than the same reason anyone would, who's lending money to someone else, that there's some question as to whether it will or won't come back. Maybe he hopes, I assume he hoped he would get money, otherwise he wouldn't have entered the deal at all. Well, it's interesting, Judge Lynch, that you say he got the pledge. If you look at the loan agreements, the pledge is supposed to be to KLCC, right? I mean, KLCC is supposed to get the pledge. If you look at the loan documents, pages 174 and 186 of the appendix, they are not signed by KLCC. They are unsigned. Every other loan document in this case, our loan documents and the previous pledge agreement that was extinguished by repayment of a debt in June are all fully signed. This one is not signed, and it's a major component of the deal. Problems in your documents as well. There are. Yeah, so it seems it was sloppy paperwork on both sides. And Mr. Sharpe is giving money to Mr. Dweck out of the bank all through the Ponzi scheme. There is no indication that anything Mr. Sharpe did was fraudulent. And to suggest that is just wrong, Your Honor. I'm sorry. It's been gone over. When he realized there was a problem, he paid the loan off with his personal funds. It was gone over by the federal authorities. There was no indication that he ever did anything fraudulent. In fact, he got money out of the bankruptcy, whereas Mr. Carey had to pay money to the bankruptcy trustee. So that's just not correct. I'm sorry. I'm sorry, Judge Chin. I missed your question. It's fine. There are problems with our documents. Principally, the Schedule A of the stock was not initially attached to our pledge agreement. But there was testimony from Mr. Dweck and Mr. Sharpe that a schedule of stocks was provided in February 2006 that was meant to be Schedule A. And two federal judges in New Jersey held, Judge Ferguson in the Bankruptcy Court affirmed by Judge Pisano in the District Court, that that was enough to create an issue of fact on that to go to a jury. I'm not saying that we don't have problems with our documents. I'm just saying a jury should look at this and assess credibility of Mr. Sharpe, Mr. Dweck, and Mr. Carey, and determine who's telling the truth. You also have the delay in collecting the loan. If the loan documents are correct, KLCC was due to be repaid in September 2005. They did nothing. The payment was not made. $14 million plus an additional profit on top of it was not made in September 2005. And in fact, they did nothing to try to collect the money until April 2006. That was the first time they ever tried to get a hold of the stock account. They interfered with the transfer to us in February, but they took no affirmative steps to take possession until April. And that is something that a jury could look at and say, if this was a real deal, if this was not a fictitious arrangement from the beginning, then there would have been steps taken to collect that stock as soon as this loan went into default. You also have this question of journal entries. I asked Mr. Carey at deposition, do you have any evidence that you advanced this $14 million on behalf of KLCC, as opposed to trading on your own account and getting money on your own account? He said he had no loan documents at all. He had journal entries. KLCC is his family entity. And he went to great lengths to say it was not his alter ego. It was at arm's length with other officers. But it doesn't matter, does it, where the consideration comes from? No. But it matters why the consideration was paid. If it was not paid in connection with the real estate deal, if it was paid on Mr. Carey's own account, that creates an issue in a juror's mind. When you have a loan document that says we're lending you $14 million, Carey provides $14 million, the pledge is then made to KLCC. Why is it, again, that we are thinking that this $14 million was not in connection with that transaction? Because he has a history of making direct personal payments to Mr. Dweck in exchange for payments back from Mr. Dweck, who's conducting a Ponzi scheme at the time. And you don't have loan documents, Your Honor. They are not countersigned by KLCC. And these are all things that a juror could look at and say, I have problems with this. If I may just take ten seconds on the fees issue, unless there's another question on that issue. Ten seconds, go ahead. Okay. The law on the circuit's clear. The payment was supposed to come out of the interpleaded funds. It was not supposed to come from us. You can look at September Tide. You can look at all the cases we cited in our brief. There isn't- The case is a little bit unclear, but it also says ultimately it should be charged to the losing party. That language is in the same Second Circuit decision. No, Your Honor. You're looking at globe indemnity, and if you look at- I am looking at globe indemnity. And it says that's the English rule. And then it applies that. It says we should apply that. No, it does not. It says it has to go back to the district court for a statement of reasons as to why it shouldn't be paid. Judge, it does. If you look at the end of globe indemnity, it says that. Believe me, I read the case. Okay. And it goes on to say there's no reason to deviate from the usual rule. You have some rebuttal time. We'll hear from your colleague on the other side. May it please the court. My name is John Jenkins. I'm here representing Citigroup Global Markets, Inc., the interpleader plaintiff below, and the appellee here. My client has no involvement with the vast majority of the issues that are before the court today. The only issue before the court relating to my client is the attorney's fees issue. And with respect to that, there is only one issue that has been raised by any party that is making an appeal. And that is not the amount of the attorney's fees or the right to attorney's fees, but only who should have paid them. Citigroup is now, as it has always been, indifferent to who pays its attorney's fees, but just asks that they be paid. That has become a slightly more complicated issue, as far as Citigroup can tell, because the funds that were effectively deposited in court, they weren't actually deposited. They were controlled by the court in an investments account. What is the rule? I mean, the Globe indemnity case is a little unclear. I mean, in one sentence it says, usually we take it out of the interpleaded funds. But then in another sentence it says, but ultimately the losing party should pay absent special circumstances. So what is the rule? How do you apply it here? As I say, my client is indifferent, but my reading of the rule is that the interpleader plaintiff initially gets the funds from the interpleaded stake. So that the interpleaded plaintiff is not put to additional cost and trouble trying to recover its costs and fees. So your position is, you should already have that money because it should have been paid out of the fund, whether or not there is then a judgment entered in favor of KLCC against D&D. Is that what you're here to say, do I understand correctly or not? That's my understanding of the law. But as I say, we didn't take a position as to limiting the source of the funds to us. We understand that there is law, however the court did it. We're fine with that as long as we get paid, but that is our understanding of the law. Yeah. Well, when you say you don't take a position, though, I'm a little unclear. I mean, after all, you have not been paid, am I right? That's correct. And what you have in the order that was presented is a judgment against D&D for that amount? That's correct. And that is less advantageous to you than an order that directed that the money be paid out of the fund, and then a judgment entered in favor of KLCC against D&D, right? That's correct. And I take it you take no position ultimately on whether there should be such a second judgment. You don't care whether KLCC recovers against D&D. But it sounds to me like you're also saying you take no position really on whether the law is that you should get paid in the first instance? Well, in the sense that D&D has argued that we limited our application for attorney's fees, which we did not. We were asked by the district court our understanding of what the law was on who should pay. And it's, as I said, and frankly— I guess I just don't understand what you are asking us to do or not do. Have you filed any kind of cross-appeal? We did not. So then— So we can only defend the judgment below. Okay. The fund's been released? They have been released, and that's the problem. So you need to get the money back from one or the other? That's correct, Your Honor. And you don't care? As long as we get it, we don't care. Well, you don't care, but unless we affirm the judgment, it sounds to me, you're not going to get what you want? I mean, if we— I'm just trying to understand, you know, what the mechanics are here. Suppose we were to agree, for example, with the district court that ultimately the money should come from D&D. On the other hand, if the funds have already been released to KLCC, what kind of outcome would result in you being in a better position in this case? If this court affirms the court below on the substantive issue of who is entitled ultimately to the interpleated stake, then it should also affirm the payment by D&D because the funds no longer exist and they won't get them. If this court should go the other way and reverse, then it seems to me it probably logically follows that who should pay has to be reversed as well because the rationale in the court below was that it was D&D. Excuse me. If we were to reverse the judgment or vacate the judgment as requested by the only party that has filed an appeal here, the issue of attorney's fees would become moot because the case goes on. No, Your Honor. When in an interpleader action, normally the case goes on after the interpleader is left and would go on without the interpleader because no one has contested the summary judgment in favor of Citigroup on the interpleader and on the counterclaims. I see. So there is not, as you understand the appeal, it relates only to ownership of the fund and neither side is pressing any counterclaim against or cross-claim against you at this point in this court. That's correct. Okay. So in that event, then the issue of attorney's fees would be ripe is your position to be resolved because you're no longer in the case. You're dismissed from the case. That's correct. Okay. I got it. Okay. Your Honor? We're out of time. Go ahead. I'm sorry. I was just going to say the only other concern I have is that you not merely reverse the attorney's fees order as a whole but specify that if it comes to that, it's only as to who pays and not the amount or the right to attorney's fees. Thank you, Your Honor. Thank you. May it please the Court. Good morning, Your Honors. My name is Ryan Pinkston. I'm here on behalf of KLCC Investments and Kenneth Carey. I'd like to pick up where Mr. Jenkins left off on the attorney's fees issue briefly. We believe the rule stated in Globe Indemnity is the better one. And ultimately, the rule should be that the losing claimant, absent special circumstances, should be taxed with the fees and costs. It's of little moment to KLCC whether that award comes from the interpleaded fees along with an attendant right for KLCC to pursue D&D trust as the losing claimant for those fees or whether Citigroup is charged with the collection efforts as to D&D trust. The important point is under either scenario, the losing claimant bears responsibility for those fees. In fact, the cases that cited in the briefing where the court took the fees out of the interpleaded funds, in most of those cases, it's unclear, it's either unclear what happened with respect to the losing claimant or the court affirmatively states that the fees will be paid out of the interpleaded funds as a matter of convenience and that the losing claimant shall replenish the funds so that the winning claimant doesn't suffer the burden of paying those fees. We think that that's the better rule based on Globe Indemnity and also just on common sense. It appropriately apportions risk. How do we get to the other issue and that is- Sure, Your Honor. Why is there not a tribal issue as to whether your Mr. Carey was involved in the fraud in light of apparent questions in the documents, the inability to find the control agreement, etc.? Your Honor, a couple points to correct here from Mr. Killian. First of all, July 18, 2005, there's a profit participation agreement and a pledge in security agreement executed by KLCC and then value is given to the debtor. That's all that UCC requires. It doesn't specify the source and in fact, Mr. Killian's rule- Those documents are both fully executed? Yes, Your Honor, I believe so. I believe Mr. Killian is drawing a distinction about whether KLCC executed it or Mr. Carey executed it as a principle of KLCC. It's a distinction without a difference, Your Honor. It depends. What does the signature block say? I haven't looked at this particular document with that in mind. Does it say KLCC and it's signed by Carey on that line or is it just signed Carey? I believe it says KLCC and it's signed on that line by Carey but frankly, Your Honor, this issue was never raised by D&D Trust before the trial court so it's not an appropriate issue for this court to resolve in the first instance. D&D Trust raises the argument with respect to where value comes from- Well, I'm just looking at- Yes, Your Honor. JA 174. There is a signature block for KLCC and then to be signed by Mr. Carey but it's not signed. What is that document that Your Honor is looking at? Is that the pledge agreement? This is the PPA. Okay, Your Honor. If you look at JA 639-47, I believe that's the executed profit participation agreement and JA 648-57, which follows immediately thereafter in the joint appendix, is the July 18, 2005 pledge and security agreement. This first one was someone's file copy. No, 644, it's not signed either. But that's the profit participation agreement, Your Honor. I believe the pledge and security agreement is signed unless I'm mistaken. That's 648-57. But additionally, I don't believe the signature is of import because the parties proceeded to pursue- 656, not signed. You don't have a signed copy anywhere in the record? Fully signed? Not as far as I'm- The copy that's in the joint appendix is the copy we have, Your Honor. But again, let me reiterate, this issue was never raised before the trial court and there's never been any question that these documents were authentic and that the parties, KLCC and Dweck, proceeded under these agreements. And if that's an issue for reversal, then we also need to look at Amboy Bank's own documents where they purport to attach a security interest in collateral with a blank Schedule A with all the other loan documents referring to an investment account at Brown & Company. So at most- I see my time has expired, Your Honor, if I could finish the thought. Yes, you can. At most, we have a wire transfer with a reference to the 54 Broad Street transaction which is the property that's identified in the profit participation agreement and corresponds with the date of the pledge agreement that specifically identifies the collateral at issue here that happens in July 2005 with Amboy's documents which purport to give Amboy an interest in an investment account at Brown & Company that indisputably never had the assets in question here. Thank you. Thank you. We'll hear the rebuttal. Your Honor, I just think this is a situation where you can't look respectfully at a couple of paragraphs in unsigned documents without looking at the totality of the circumstances and the pattern of the business activities. Was this issue raised below that- I believe it was raised- A fully executed copy in the record? I believe it was raised before Judge Sand, and I think when he dropped that footnote, he said there are a lot of inconsistencies in the loan documents, and I think that was one of them. But I can't point you at a specific page right this second. And I just want to close with Globe Indemnity. Perhaps I'm misreading it, Judge Chin. I didn't mean to suggest that you hadn't read the decision. Obviously, you have, and so did Judge Preska. But I would like to point out that September tied publishing was decided far after Globe Indemnity by this court in 1989, and the court said that the stakeholder is entitled to be awarded costs and attorney's fees, but, quote, fees are generally awarded against the interpleader fund but may, in the discretion of the court, be taxed against one of the parties when their conduct justifies it. Let me back up. As far as things that are raised and not raised in the district court here, there was an application by Citigroup for attorney's fees. Yes. It, I guess, didn't take any position as to whom it was to come from. D&D, I'm sorry, KLCC then contested the amount and said we, but we want it to be entered against D&D. And my understanding is you said we're not taking any position, we're just going to win this on appeal. I don't think that's correct, Judge. I don't think KLCC ever said we should pay it. They were arguing about the amount. And if you look at the order. I checked that. So the question is what, you know, well, okay. If it were the case that KLCC made an application to the district court that the fees should be awarded against you, something that you acknowledge even under the more recent Second Circuit opinion the district court could do in its discretion, and you did not contest that, would that not be a waiver? I don't think anybody made a motion against us, Judge. I don't think anybody asked that we pay the fees. Did the district court direct both of you to respond to the motion? The district court said I'd like views from the parties as to how the fees should be paid, but then city group. Including views from D&D. But city group moved for payment from the account. And if you don't believe that, the order that they submitted to the court says that. The order they submitted to the court says it should be paid out of the account. I can't respond to motions that weren't made against me. I'm supposed to imagine what they would say if they were made? I don't think KLCC did argue that we should pay below. I could be wrong, but I don't think they did. Thank you. We have your argument. Thank you, Your Honor. And we'll reserve decision.